**UNITED STATES of America,
Appellee,**

v.

**Ralph CIANCHETTI, Charles Hedges and Molly Schau, Defendants-Appellants.**

**No. 252, Docket 26996.**

United States Court of Appeals
Second Circuit.

Argued March 7, 1963.

Decided March 21, 1963.

Ira B. Grudberg (of Jacobs, Jacobs, Jacobs & Jacobs), New Haven, Conn., for appellant Cianchetti.

Frances Kahn, New York City, for appellant Hedges.

Maurice Edelbaum, New York City, for appellant Molly Schau.

Arnold M. Stone, Atty. Dept. of Justice, Washington, D. C. (Robert C. Zampano, U. S. Atty., New Haven, Conn., Herbert J. Miller, Jr., Asst. Atty. Gen., and Beatrice Rosenberg and Philip Wilens, Attys., Washington, D. C., on the brief), for appellee.

Before CLARK, WATERMAN and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

The appellants were convicted of conspiracy to violate the federal narcotics laws, 21 U.S.C. § 174, after a five-week trial in the United States District Court for the District of Connecticut before Judge Timbers and a jury. The three appellants, in addition to several other individuals, were named in a one-count indictment charging a conspiracy to import unlawfully into this country large quantities of heroin and knowingly to receive, conceal, buy, or sell such heroin subsequent to importation. The fourth defendant in the court below, Joseph Cahill, was tried *in absentia* and is not before this Court.

We reverse the conviction of Ralph Cianchetti and order that the indictment as to him be dismissed. We affirm the conviction of Charles Hedges. The conviction of Molly Schau is reversed, and we remand for a new trial.

I.

The conspiracy charged and proved by the Government to the satisfaction of the jury was designed essentially to secure furtively the importation into this country of heroin from Europe, more particularly from Marseilles, France, and to distribute and sell the heroin in this country. Marseilles was the headquarters of the three Aranci brothers— George, Joseph, and Marius, the last of whom was affectionately known as the "Old Man"—and their assistant, Georgette "Jackie" Arrassus, who acted as contact and interpreter for the English-speaking coconspirators. The two chief government witnesses were Clarence Aspelund and Theodore Warycha, merchant seamen, who were the transatlantic links in the chain of importation—the latter in his capacity as a special employee of the Government. Throughout most of the period here relevant, 1955 through 1960, Aspelund would receive periodic communications from the Arancis, with whom he would usually rendezvous and from whom he would receive the quantities of heroin. These he would bring into this country via New York or Hoboken and transfer them, allegedly to one of the appellants: in 1955, to Molly Schau; and during 1958 and 1959, to Charles Hedges. Warycha, Aspelund's replacement in mid-1960 and a special employee of the Government, attempted to arrange for delivery to Ralph Cianchetti. That, in brief, is the conspiratorial picture.

In 1952, Neil Schau, husband of appellant Molly Schau, introduced Aspelund to Marius Aranci in Marseilles, and it was agreed that all were "to do business" together. Between that time and some date in 1955, Aspelund smuggled heroin from Marseilles to Neil Schau in New York. In early 1955, with Neil Schau critically ill, his wife Molly asked Aspelund to determine whether the Arancis would be willing to deliver heroin to her instead. After securing the consent of the "Old Man", Aspelund made several deliveries to Molly in 1955, the last of which took place between December 22nd and 25th of that year. This was the last delivery, not because it was agreed to be such, but because Molly Schau is alleged to have absconded with the heroin delivered at that time and to have refused to make payment for it.

Somewhat distraught that he could not make full payment to the Arancis for the shipment of December 1955, because of Molly Schau's conduct, Aspelund made no further arrangements with them until shortly before April 1956. At that time the "Old Man" informed him that there was to be a new "connection" in New York, who was to identify himself by producing one half of a torn French 100 franc note. The other half was given to

Aspelund by the "Old Man." In April 1956, Aspelund made contact in New York with defendant Joseph Cahill, and arrangements were made and soon consummated for several future deliveries. An associate of Cahill, appellant Hedges, was introduced to Aspelund in September or October of 1958, and Hedges was actively involved in the receipt of heroin from that time until July 1959. The first delivery to Cahill which was conducted in Hedges' presence was initiated by a transfer of money to Aspelund; but the payment was less than the required sum. Cahill sent Hedges to "get that money," and Hedges obliged. Upon receipt of the full amount, Hedges was sent out to retrieve the package of heroin which had been locked in Aspelund's car. Further deliveries were made to Cahill and Hedges in 1959, the last in September. At this time, there was a shortage in payment, followed by a phone call from Hedges to Aspelund requesting the return of $5000 because of the inferior quality of the heroin just delivered

Aspelund was arrested in April 1960 and the following month Theodore Warycha, a neighbor of Aspelund and a shipmate and acquaintance for seven years, agreed, in Aspelund's presence, to assist the Government in the role of a special employee. Warycha made contact with "Jackie" Arrassus and, through her, with the Aranci brothers. Warycha was told by the "Old Man" that he, Warycha, would be acceptable as a courier to deliver heroin "to somebody in New York, that he thinks he has a connection. He is not sure." One half of a French theatre ticket was given to Warycha and, in August 1960, after his return to the United States, he received a telephone call from and arranged a meeting with appellant Cianchetti, at which meeting Cianchetti produced the other half of the theatre ticket. During their meeting, on September 1, 1960, Cianchetti informed Warycha that he had known the Arancis for thirty years and had been offered large quantities of heroin by the "Old Man". He also told Warycha of the difficulties in distributing heroin upon its reaching this country, and cautioned him about dealing with racketeers and strangers who might fail or refuse to pay. Cianchetti made known that he was presently the object of a deportation or other citizenship proceeding and therefore could "do nothing at all * * *. I can go no place * * *. I can't move." He nonetheless arranged for the location and method of some future meeting, and agreed to be ready should Warycha call.

Warycha did call, on October 17, 1960, after bringing another shipment of heroin into this country. Cianchetti met him in Hoboken, and upon being told that the "Old Man" had sent him three kilos of heroin, Cianchetti responded, "Oh, oh, no. Are you crazy or something? You make a mistake. There is something wrong * * *. I'm in a hot spot and people over there know I'm in a hot spot." Moments later, over a cup of coffee, Warycha threatened to find another buyer for the heroin, at which point Cianchetti relented somewhat, asked how long Warycha would be home, and told him that he might be able to help him out. After noting that the packages would have to be tested, Cianchetti took leave, saying, "Well, probably you'll hear soon." Warycha never heard from Cianchetti again.

## II.

We shall first consider those contentions raised on behalf of particular appellants; we shall then proceed to examine those contentions which affect all of the appellants.

█ *Cianchetti.* Appellant Cianchetti, for purposes of this appeal, does not contest the Government's proof that a conspiracy existed or that Cianchetti had knowledge of its operations. He argues, however, that there was insufficient evidence to warrant the conclusion that he entered, participated in, or furthered the conspiracy. We agree, and we therefore reverse his conviction and dismiss the indictment as to him.

█ There is little doubt that Cianchetti knew of the Marseilles group, for

he admitted to Warycha in their conversation in September 1960 that he had known the Arancis for thirty years and that they had offered him large quantities of heroin; moreover, he discussed with Warycha the problems of distribution and of securing prompt and full payment. But knowledge of the existence and goals of a conspiracy does not of itself make one a coconspirator. There must be something more than "[m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy * * *." Cleaver v. United States, 238 F.2d 766, 771 (10th Cir., 1956). This "something more" is generally described as a "stake in the venture." "[I]n prosecutions for conspiracy * * * [the defendant's] attitude towards the forbidden undertaking must be more positive. * * * he must in some sense promote their venture himself, make it his own, have a stake in its outcome." United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). See United States v. Tramaglino, 197 F.2d 928 (2d Cir., 1952)

Rather than revealing a stake in the conspiratorial venture or an affirmative attempt to further its purposes, Cianchetti's statements of his intention were at least equivocal, at most clearly disclamatory. We know that the "Old Man" thought, but was not sure, that he had a new connection in New York, and that Cianchetti produced the other half of the theatre ticket given by the "Old Man" to Warycha. But from the first, in September 1960, Cianchetti disclaimed any intention of buying heroin from Warycha because of his fear that he was under surveillance in connection with a pending deportation proceeding. There was no fixed agreement to cooperate in the venture, and Cianchetti could only answer in the affirmative when Warycha asked, "You can do nothing at all. Huh?" and "When I go over there, I'm going to explain to him. Ah, what happened here for you and right now you can't do nothing. Right?" The two men did establish a method for meeting

again in the future, but when they did meet, the following month, Cianchetti again stated that he was "in a hot spot". Even though his protestations soon diminished somewhat, the most he could say in support of the conspiratorial enterprise was "Well, maybe I could help you out. I don't know." When told that Warycha would be at home for four more days, Cianchetti said, "Well, probably you'll hear soon." The four days passed, and Cianchetti was never heard from again.

Neither we nor the District Court sits in judgment of an individual's reasons for abstaining from an agreement to commit a crime. Cianchetti's motives may not have been wholly laudatory, but the fact remains that the evidence shows that he did indeed abstain. He did not cast in his lot with the conspirators, did nothing to further the success of the enterprise, and had no stake in its outcome. His conviction must be reversed.

 *Hedges.* Shortly after the commencement of the trial, defendant Cahill voluntarily absented himself from the jurisdiction and his counsel, one assigned by the court and another purportedly retained by Cahill, were permitted to withdraw from the case. The trial judge instructed the jury that Cahill would be tried *in absentia* and that all procedural safeguards normally due a defendant would be extended to him in his absence. Codefendant Hedges moved for a mistrial and severance, asserting that he would be personally prejudiced by the continuation of the trial against Cahill, but these motions were denied. We find no error in the denial of these motions. The trial of an individual properly joined with others in a conspiracy indictment should not be delayed indefinitely to await the capture of a fugitive coconspirator. See Rosenthal v. United States, 45 F.2d 1000, 1003, 78 A.L.R. 1415 (8th Cir., 1930). This is a sound rule, for there are instances where flight to distant parts of the world render apprehension of the accused difficult or impossible. To require the court to wait indefinitely for the capture of a

fugitive whose locus is unknown would undermine the very purpose of our enlightened Federal Rules of Criminal Procedure: "to provide for the just determination of every criminal proceeding * * * simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Fed. R.Crim.P. 2. Furthermore, there was no discernible prejudice to defendant Hedges, whose attorney could have protected his rights by raising appropriate objection to matters deemed prejudicial to his client.

■ Hedges also contends that there was inadequate proof that he knew that the substance with which Cahill was dealing was narcotics. There was, however, direct proof that Hedges telephoned Aspelund in September 1959, seeking the return of $5000 previously paid because the heroin supplied was of low quality. The inordinately large amounts of money which changed hands between Cahill, Hedges and Aspelund, accompanied by the furtive nature of their dealings, provide considerable circumstantial evidence to corroborate the conclusion that Hedges knew he was dealing in narcotics. See United States v. Agueci, 310 F.2d 817, 828–829 (2d Cir., 1962).

■■ *Molly Schau.* It is first contended by appellant Molly Schau that the trial court committed error in denying her motion to dismiss the indictment as barred by the statute of limitations and in failing to instruct the jury on the relevance of the limitations period. The indictment, dated November 16, 1960, charged Molly Schau with receiving heroin "on divers dates between January 1, 1955 to December 25, 1955", and item 4 of the bill of particulars charged an overt act in receiving heroin between December 22nd and December 29th of that year. By charging an overt act within the five-year period of limitations made applicable to this conspiracy by 18 U.S.C. § 3282, the indictment was not subject to attack upon its face. Moreover, government witness Aspelund testified that his last delivery of heroin to Molly—for which she never paid—was

consummated between December 22nd and 25th, 1955. Aspelund's wife corroborated his testimony in several respects, setting the time of the episode as "just before Christmas." The appellant contends that there was such ambiguity in the Government's evidence as to the relevant dates, that the question whether her acts were in fact committed within five years of the filing of the indictment should have been submitted to the jury. But no such instruction was requested in the court below.

■ Appellant next contends that there were certain direct and prejudicial references to her in the conversation between Cianchetti and Warycha in September 1960; the conversation was tape recorded by narcotics agents and played to the jury during the course of the trial. She asserts that these prejudicial references were hearsay and not admissible against her as statements by co-conspirators in furtherance of the conspiracy, and that she had withdrawn from the conspiracy some five years earlier. The objectionable portions of the conversation are the words of Cianchetti, who, in response to Warycha's suggestion that he might do business with the wife of Neil Schau, responded, "No. You don't get the money * * *. It's racketeer. It's no business people. You understand, bunch of thief and bunch of loafers. Gamble, number. You know what I mean. If you go over there. Give 20 pounds. Then when you give stuff, no money * * *. The wife is no good. The wife is no good. Understand what I mean and the poor man work so hard. After he make a lot of money. She ruin the man."

■ We need not decide whether appellant Molly Schau was still within the net of the conspiracy in September 1960. We simply note that participation in a conspiracy may continue beyond the performance of an overt act by the alleged conspirator, if the conspiracy continues in existence thereafter; affirmative proof of withdrawal is generally required. See Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114

(1912). What we do decide is that, for other reasons, the Cianchetti-Warycha conversation was clearly hearsay as to the appellant and inadmissible as to her. It represented a narrative discussion between Warycha, who was a government agent and not a member of the conspiracy, and Cianchetti, who we now hold never agreed to enter the conspiracy. It therefore cannot be urged that the remarks about the appellant were made in furtherance of the conspiracy by one of the conspirators. Whether the appellant was still a participant in the conspiratorial enterprise in 1960 would not affect the admissibility of this succulent gossip.

 The admission of hearsay testimony does not, of course, necessarily require reversal, for Fed.R.Crim.P. 52 provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Helpful in determining whether the appellant has been substantially prejudiced by the admission of this hearsay testimony is the discussion of the Supreme Court in Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), which involved the admission in evidence of a signed confession of a proven conspirator given after his arrest and withdrawal from the conspiracy and containing references to another conspirator. Two of the cardinal elements there noted by the Court as relevant to the question whether the conspirator referred to suffered substantial prejudice were the strength of the case against him independent of the hearsay statement, and the clarity of the trial judge's instructions as to the limited use of the confession, which was properly admissible only against the declarant.

Here, unlike Delli Paoli, the evidence against Molly Schau, although substantial, was not uncontradicted, for the defendant herself took the stand in her own defense and gave testimony greatly at variance with that offered by Aspelund and his wife; we shall never know how much the references to her in the Warycha-Cianchetti recording influenced the jury to disbelieve her. But, even were we to agree that the case against her was so substantial that the admission of this hearsay under proper instructions could in no way have been prejudicial, the fact remains that no such limiting instructions were given here. When the tape recording of the Warycha-Cianchetti conversation was offered in evidence, Molly Schau's attorney strenuously objected on the ground that it was merely narrative rather than in furtherance of the conspiracy. After its playback to the jury, counsel moved to strike it, asserting that it was damaging hearsay testimony. Damaging it no doubt was. For it is rare that the jury is permitted to hear assertions that the defendant is a "thief", "racketeer", "loafer", "no good" and the cause of her husband's ruination. The recorded conversation cried out for a strong limiting instruction; but no such instruction was given either at the time the tape was played or at the time its substance was recounted by the judge in his instructions to the jury. Moreover, we are mindful of the fact that the original tape was played to the jury; this imparted to the jurors a sense of immediacy, a feeling of "being present" during the occurrence of a crucial episode in the unfolding of the conspiracy, which might well have painted in especially bold strokes the portrait of Molly Schau's apparently unsavory character.

It is questionable whether under all of these circumstances even a clear limiting instruction would have cured the error. The opinion of the closely split Court in Delli Paoli states the problem thus: "The issue here is whether, under all the circumstances, the court's instructions to the jury provided petitioner with sufficient protection so that the admission of Whitley's confession, strictly limited to use against Whitley, constituted reversible error." 352 U.S. at 239, 77 S.Ct. at 298. Mr. Justice Frankfurter, for himself and Justices Black, Douglas and Brennan took issue with the majority's disposition, declaring that

an admonition, even if given, would have been ineffective under the circumstances there present to safeguard the petitioner from prejudice, for the declaration, of only limited admissibility, "cannot be wiped from the brains of the jurors." 352 U.S. at 247, 77 S.Ct. at 302.

We observe, in summary, that all of the elements which moved the majority, over the dissent of four Justices, to uphold the conviction of the petitioner in a case akin to the present one are missing here. Unlike Delli Paoli, the Warycha-Cianchetti conversation, in view of our holding as to Cianchetti, was between two individuals neither of whom was ever a member of the conspiracy. Another distinguishing factor is the absence here of a clear, limiting instruction. Indeed, as we have already indicated, even if such an instruction had been given, it is doubtful that Cianchetti's venomous and damaging utterances concerning the appellant could have been "wiped from the brains of the jurors," especially in light of the impact which the playback of a recording—as distinguished from the reading of an ordinary statement—had upon the jury.

We are aware of the difficult burdens imposed upon the District Judge in the trial of these conspiracy cases. The task of marshalling the evidence and presenting it to the jury with impeccable clarity as to its proper use and limitations is one requiring great care and patience. Although the District Judge here exhibited those virtues in high degree, we are nonetheless constrained to hold that the admission of the Warycha-Cianchetti conversation substantially prejudiced the appellant. We reverse the conviction of Molly Schau and remand her case for a new trial.

### III.

In view of the affirmance of Hedges' conviction and the remand for retrial of Molly Schau, we shall deal with several other points raised on appeal.

■■■ *Transcript of Grand Jury Testimony.* After the direct testimony of government witnesses Aspelund and Warycha, a motion was made requesting the court to examine the minutes of the evidence those witnesses had given before the grand jury. Since there had been no court reporter present at the grand jury proceedings, the district judge denied the motion. Counsel then moved to strike the testimony of Aspelund and Warycha, citing the language of this Court in United States v. Giampa, 290 F.2d 83, 85 (2d Cir., 1961):

"If the Government calls a witness who has given testimony before a Grand Jury, it is under a duty to have the transcript of such testimony available upon the trial. If it is then established at the trial that the witness has testified before the Grand Jury and defense counsel requests that the trial court examine the minutes for inconsistencies in testimony given upon the trial and before the Grand Jury, the trial court should read the minutes and if inconsistencies be found should make such portions of the minutes available to defense counsel."

The motion to strike was denied.

■■■ We find no error in the disposition of the motion. It is quite clear that the principle set down in the Giampa case is a sound one and one to which this Court heartily subscribes. But we there fashioned a duty for the United States Attorney only in those cases—as in Giampa itself—in which the grand jury proceedings have been transcribed and minutes actually exist. While the presence of a stenographer in the grand jury room to transcribe the witnesses' testimony would be the better procedure, there is no constitutional requirement that grand jury proceedings be transcribed, and we have been able to uncover no provision of rule or statute which makes transcription mandatory rather than permissive. See United States v. Borys, 169 F.Supp. 366, 368 (D.Alaska 1959); United States v. Martel, 17 F.R.D. 326, 328–329 (N.D.N.Y. 1954); Orfield, The Federal Grand Jury, 22 F.R.D. 343, 452 (1958); cf. United States v. Labate, 270 F.2d 122, 123–24 (3d Cir.), cert. denied sub. nom. Suss-

man v. United States, 361 U.S. 900, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959); 28 U.S.C. § 753.

 *Single Conspiracy.* It is contended that the Government's proof revealed not a single continuing conspiracy, but a series of separate and distinct conspiracies each existing at a different point in time. The claim is made that this variance between indictment and proof is so prejudicial as to warrant reversal. We do not agree.

 We have here a typical conspiratorial grouping, established to transact "business" over a considerable period of time. The Arancis were the "core" group, and government witnesses Aspelund and Warycha represented the transatlantic link in the importation chain. Molly Schau purchased from Aspelund in 1955, and Hedges and Cahill purchased from him in 1958–59. Despite the separation of these activities in time, the conspiratorial operation was conducted by similar methods throughout the relevant five-year period. The Arancis selected a merchant seaman as courier, and decided whether the individuals in this country who were to act as importers were acceptable. The use of a torn piece of paper as a means of identification and contact, with all such arrangements initiated by the Arancis and assisted by "Jackie" Arrassus, represented a common "trademark" in the conspiracy's operations. All of the importers had a common interest in the success of the Arancis' enterprise and the Arancis had the same interest in the importers. See generally United States v. Agueci, 310 F.2d 817, 826–828 (2d Cir., 1962). The mere passage of time, without more, does not necessarily fragment a single conspiracy. See United States v. Tramaglino, 197 F.2d 928, 930 (2d Cir., 1951), cert. denied 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952).

 *Credibility of accomplices.* After the completion of the charge to the jury, which contained the usual instructions concerning the weight to be given the testimony of witnesses as affected by their bias or their interest in the case, counsel excepted, claiming that the jury should have been instructed to scrutinize with special care the testimony of coconspirators. The failure to charge the jury in precisely those terms is asserted by Hedges and Schau to warrant reversal. We disagree.

We have little doubt that the trial judge in conspiracy cases would be well-advised to caution the jury as to the scrutiny appropriate in considering the testimony of accomplices. But the failure to so caution should not be made the cause for reversal unless it has resulted in substantial prejudice. We find no such prejudice here. The usual instructions as to bias and interest were given by the trial judge. In their summations to the jury and in their motions to the court, defense counsel made repeated references to the asserted inconsistencies in the testimony of the government witnesses, and these references were reiterated in the judge's instructions. Moreover, there was testimony from other individuals introduced in corroboration of that of the accomplice Aspelund. This case is therefore sufficiently distinguishable from United States v. Masino, 275 F.2d 129, 133 (2d Cir., 1960), where the failure to give a specific instruction concerning the weight of accomplices' testimony was, when combined with other errors in the trial court, sufficient to tip the scales for reversal. See also Cratty v. United States, 82 U.S.App.D.C. 236, 163 F.2d 844, 850 (D.C.Cir.1947); United States v. Becker, 62 F.2d 1007, 1009 (2d Cir., 1933).

We find appellants' other contentions to be without merit.