**UNITED STATES of America,
Appellee,**

**v.**

**Dewey Joseph AYERS, Appellant.**

**No. 413, Docket 33660.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 16, 1970.

Decided May 4, 1970.

Michael R. Wolford, Asst. U. S. Atty., Buffalo, N. Y. (H. Kenneth Schroeder, Jr., U. S. Atty. for the Western District of New York, Buffalo, N. Y., on the brief), for appellee.

Charles F. Crimi, Rochester, N. Y., for appellant.

Before MEDINA, WATERMAN and SMITH, Circuit Judges.

MEDINA, Circuit Judge.

After a trial to Judge Burke and a jury Dewey Ayers was convicted on Counts Three and Four of an indictment charging him with aiding and abetting his co-defendant, Mervin Hadden, Jr., in passing and uttering on May 1, 1968 a counterfeit $20 bill at Lou's Dinerette in the up-state Village of Newark, N. Y., and with possession, together with Hadden and another co-defendant, Michael Kearney, of approximately 80 counterfeit $20 bills all bearing the same serial number as the one passed at Lou's Dinerette. On his appeal from the judgment of conviction Ayers relies principally upon allegedly unconstitutional lineup identifications during the afternoon of May 1 and again the next day. He also asserts a miscellany of alleged errors that we shall briefly discuss later on.

The evidence disclosed that a number of these bogus bills, all bearing Serial Number B83696552B, and drawn from the same plate, were passed on May 1, 1968 at various business establishments in the Village. The first was given to a waitress at Lou's Dinerette about 8 o'clock in the morning, and the last one was handed to a counter girl at Woolworth's shortly before noon. The counter girl at Woolworth's thought the bill looked queer and it shortly reached the possession of the manager of the store. When the manager turned to accost the person who had passed the bill, he had disappeared without waiting for his change, leaving behind a paper bag containing 3 cups full of coffee. This man turned out to be the co-defendant Hadden. In the meantime, the co-defendant Kearney entered the store, stared at the $20 bill in the manager's hand, purchased a greeting card, and left. While the manager was checking the authenticity of the $20 bill at a nearby bank, one of the girls in Woolworth's exclaimed "there goes one of the guys who was in the store" and Mary Jane Dulmage, who had been working in the office, ran out to the curb and got the license number of the car and wrote it down. With her description of the car as blue with a black top, and the N. Y. State license number 2201 MJ the police were informed and a few minutes later State Trooper Walter J. Farrell, after receiving a radio message, picked up the car which was being driven in the direction away from Newark. In it were the 3 defendants charged in the indictment.

An alert Conservation Department employee, John J. Leupp, driving in the same direction, and at a distance of about a mile behind the place where Trooper Farrell had stopped the blue car with the black top, noticed a manila envelope "on the right hand shoulder of the road" and he stopped and picked it up. This was just about the spot where the three men in the blue car with the black top would be likely to have become aware of the fact that a State Trooper was on their trail. The manila envelope contained 80 additional bogus $20 bills all bearing the same Serial Number B83696552B. Leupp knew Farrell, and he noticed that he had stopped a car and was standing with three men beside his Trooper's car "with the red light going." Leupp waved to Farrell and continued on his way to Waterloo where he turned the envelope and its contents over to the police. He gave the time as somewhere between 12 and 1 o'clock P.M. on May 1. Leupp, of course, knew nothing of the reason Farrell had stopped the other car. He thought the bills were genuine and wanted to get a receipt from the police so he could claim the money if the owner did not appear.

The testimony at the trial discloses that during the morning of May 1, 1968 at least four of these identical counterfeit $20 bills were passed to various business establishments in Newark, N. Y. The first was at Lou's Dinerette at about 8 o'clock in the morning. The last was the one passed at Woolworth's at about noon. In the interval of time between these two another $20 bill was handed to the waitress at the Pee Wee Restaurant in payment for the three cups of coffee that were left at Woolworth's, in a Pee Wee Restaurant bag, when Hadden hurriedly departed without waiting for his change. Still another of these identical counterfeit bills was used at Brenner's Jewelry Store to buy a birthday charm costing $3.12 including the tax. This article was later found in the car.

In an effort to be sure they did not have the wrong persons, Police Lieutenant Edwin R. Krueger decided on an immediate lineup for purposes of identification. Because the defendants had to be searched and booked, 4 P.M. was the earliest time that could be arranged. They had not yet been arraigned. Krueger went out in the street and picked three men, all white, dressed in more or less business or sport clothes "of the general appearance of the people we were going to have identified." All were relatively young; none was bald. They were seated at a table in the Village Hall, with no two of the defendants side by side or together.

The police did not inform any of the defendants of the lineup in advance nor were they told they had a right to have a lawyer present.

There are various descriptions by a number of the witnesses of the defendants and the stand-ins at the first lineup. None of them had any outstanding physical characteristic. It would be tedious and repetitious to give this testimony in detail. Suffice it to say that we can find no indication of any suggestive or improper procedures of any kind. The defendants wore whatever clothes they desired, and one of them had changed his clothes since the arrest in the afternoon. No directions were given to the defendants or the three stand-ins to say anything or do anything, nor did any of them say or do anything except to stand up and turn around. No photographs were shown to any of the identifying witnesses before the lineup.

Further precautions were taken to maintain the integrity of the lineup by instructing those who were viewing the lineup that they were to remain silent and not talk to one another, that after the viewing was over each individual was to come out of the room separately and, alone with the police officer in charge, tell which person, if any, they recognized as having seen before.

The second lineup, the next morning, May 2, 1968, under the supervision of the Special Agent in charge of the Buffalo office of the Secret Service, was a

replica of the first, except that more and different stand-ins were brought in.

The indictment was filed on May 21, 1968. There was a lengthy pre-trial hearing on October 10, 1968, a few days before the trial, on the motion of the defendants to suppress any proof of identification by those who viewed the two lineups and also to suppress the articles found in the car. At the conclusion of this hearing Judge Burke denied the motions and held:

> The defendants' rights under the Federal Constitution have not been infringed, either in the manner of their arrest or the search and seizure conducted as an incident and following their arrest, or the seizure of articles taken as a result of the search, or the identification procedure used on May 1, 1968 and May 2, 1968, or in any other manner.

The only identification testimony relating to appellant Dewey Ayers was that of Linda Palladino. Her in-court identification made no reference to the two lineups nor was that subject mentioned during her cross-examination. Her testimony is brief and explicit. At about 8 A.M. after the usual early rush of customers was over two men came into Lou's Dinerette, sat down at the counter "right in front of me," she said. They were the only two customers in the place. They ordered two cups of coffee which they drank and the taller of the two with dark hair, whom she identified as Hadden, handed her a $20 bill. She identified the other man as Dewey Ayers, describing him as "him with the light hair." At the suppression hearing Linda testified that she recognized them at once. She knew none of the men summoned to be stand-ins. While she did not suspect the bill was a counterfeit, it was the only $20 bill taken in that morning and the subject of whether any $20 bills had been received was broached when Clara Finewood, a policewoman, came after the incident at Woolworth's to get Wayne County Sheriff Hurley and Lieutenant Krueger who were in the Dinerette eating lunch. This led to the discovery of the counterfeit bill and naturally helped to fix the incident in Linda's mind.

We turn to the law and will elaborate further on the facts when we come to the arrest, the search of the defendants and of the car.

Previous to the first lineup Sheriff Hurley had given the defendants the *Miranda* warning in the most explicit and comprehensive terms. Ayers replied that they did not need a lawyer as they had done nothing wrong. This warning was repeated later. We hold, however, that a separate and different warning was required with reference to the lineups. The defendant should have been told that there was to be a lineup for the purpose of possible identification and that he was entitled to have his lawyer or one provided by the State present at the lineup. This is the clear import of the Supreme Court ruling in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 decided on June 12, 1967. This ruling was explicitly made applicable to all subsequent cases, including, of course, the one before us now, in Stovall v. Denno, 388 U.S. 293, 296, 87 S.Ct. 1967, 18 L.Ed.2d 1199, decided on the same day as *Wade*.

It is clear, however, that there is no *per se* rule of exclusion of courtroom identifications. United States v. Wade, 388 U.S. at 240, 87 S.Ct. 1926. Instead the Government is afforded an "opportunity to establish by clear and convincing evidence that in-court identifications were based upon observations of the suspect other than the lineup identification." *Id.* This was the purpose of the pre-trial suppression hearing in this case. We agree with Judge Burke's ruling that the constitutional rights of Dewey Ayers were not infringed. The proofs adduced at that hearing establish in our opinion the required clear and convincing evidence that the lineup identifications played no part in the recognition by Linda Palladino of Hadden and Ayers. There were no suggestive practices to beguile the witness, the incident she described

occurred only a few hours previously on the same day, her identification was prompt and unequivocal, unshaken by a lengthy cross-examination both at the trial and at the suppression hearing, and she had a good opportunity to observe the two men as they sat at the counter face to face with her and drank their coffee. The fact that this was the only $20 bill received at the Dinerette that morning also has significance.

Nor do we find any basis for reversal in the failure of Judge Burke to order the court reporter to transcribe and make available the minutes of Linda's testimony before the Grand Jury.

When arrangements were being made during the trial for the production and disclosure to defense counsel by the Secret Service of a written statement by Miss Palladino, Judge Burke raised the question of the Grand Jury minutes *sua sponte*. It developed that her testimony had been taken down but not transcribed. When counsel for Ayers argued that he was entitled to the minutes anyway, the following colloquy ensued:

The Court: Will you tell me how you are going to get them when we haven't got them?

Mr. Crimi: If there was a stenographer present, we can get the stenographer.

The Court: I don't think there is any burden—they took them but they haven't been transcribed, and if they haven't been transcribed, we can't produce it.

Mr. Crimi: I think we are entitled to them.

The Court: All right, you say, "We are entitled to them." How do you get it?

Mr. Crimi: I say the Government should transcribe it.

The Court: There isn't any obligation by the Government, as I know, to transcribe the Grand Jury minutes. As a matter of fact, most of the time they don't even take Grand Jury minutes.

Mr. Crimi: What Your Honor says is absolutely true, but I feel the rule should be changed because the defendant is prejudiced because he cannot get the Grand Jury minutes, because the Government does not transcribe it.

The Court: You say the rule should be changed?

Mr. Crimi: Eventually, I hope.

The Court: Maybe so, but I have nothing to do with that. I don't make the rules.

There the matter was allowed to rest. We think the impression made upon Judge Burke was that counsel agreed with him that there was no rule requiring the Government to have the minutes transcribed and that, in the absence of such a rule, nothing could be done to provide counsel with a copy of Miss Palladino's testimony before the Grand Jury for purposes of cross-examination. Counsel did not suggest that a recess be taken until it could be ascertained whether the reporter's notes were available or how much time might elapse before the minutes of Miss Palladino's testimony could be typed up and made available. Nor did counsel state any reason to believe that there were any probable contradictions or other flaws in the testimony already given by the witness.

Since Fed.R.Crim.P. 6(d) merely provides that "a stenographer or operator of a recording device may be present while the grand jury is in session," the rule referred to by Judge Burke and by counsel seems to be the one enunciated in United States v. Youngblood, 379 F.2d 365, 370 (2d Cir. 1967) approximately one year and four months before the trial of this case. The rule as stated by the Court is:

* * * the district courts of this circuit at the request of the defendant should order that the defendant be allowed to examine the grand jury testimony of those witnesses who testify at his trial without having to show any particularized need for this material; we are holding that defendant should be entitled to see all the grand

jury testimony of each witness on the subjects about which that witness testified at the defendant's trial.

This rule was qualified by an observation in footnote 4 of the opinion:

It is our understanding that stenographic minutes of grand jury proceedings are now regularly taken and filed away. However, this may not have always been the practice, and where it has not been we do not imply that a defendant is entitled as of right to minutes that do not exist.

██ Although recordation as a matter of course certainly is the better procedure, see United States v. Cianchetti, 315 F.2d 584, 591 (2d Cir. 1963), this combination of rule and footnote in *Youngblood* does not require in terms that all Grand Jury testimony be recorded.[1] Moreover, the rule seems to be inapplicable in the instant case, where the testimony had been recorded but not transcribed.

██ This gap is not filled by the rule in United States v. Giampa, 290 F.2d 83, 85 (2d Cir. 1961), which imposes a duty on the Government to have the Grand Jury testimony of its witnesses available upon the trial but says nothing about what is to be done if the testimony has not been transcribed. The rule in *Giampa* does not require the trial judge to order it transcribed in time for use during the trial. But we hold that such an order is a matter of discretion for the trial judge, depending upon the circumstances of the particular case. Proper considerations in connection with the exercise of this discretion doubtless are the availability of the reporter and his notes, the time necessary to transcribe the testimony, the necessity for a more or less prolonged recess, and the showing of probable contradictions or other flaws in the testimony already given by the witness. In this case, however, no such showings were made or even suggested by counsel for Ayers. Moreover, Miss Palladino had testified fully, explicitly and consistently at both the pretrial suppression hearing and at the trial. As the defense had the written statement that Miss Palladino gave to the Secret Service prior to her Grand Jury testimony and as the defense found nothing in that statement to warrant a cross-examination of the witness, the defense was not prejudiced by the failure to have the Grand Jury minutes. But we interpret and agree with Judge Waterman's opinion in *Youngblood* to the effect that opportunity to examine transcribed Grand Jury minutes of a witness's testimony should always be accorded defense counsel for the purpose of cross-examination of that witness after he has testified at the trial.

Nor do we find anything improper about the arrest and the search of the defendants and the car. The bill passed by Hadden at Woolworth's and stared at by Kearney had been identified as counterfeit, and the license number of the car copied down before the radio message was relayed from the Newark police station. It read:

Wednesday, May 1st, 1968, one o'clock p.m. Chief Brown, Newark Police Department, called to advise that unknown subject driving blue 1966 Plymouth, New York Registration 2201 MJ, just passed a counterfeit twenty dollar bill in the Village of Newark. Request our patrols check the area. Wayne County patrols notified.

██ It is of no consequence that the blue car bearing this license number turned out to be a Chevelle and not a Plymouth. Having notified the police that he had the car and its

---

[1]. Failure to record testimony given before a Grand Jury seems still a matter about which a defendant has no right to complain. See, e. g., Nipp v. United States, 422 F.2d 509 at 512 (10th Cir. 1969), cert. denied sub nom. Bishop v. United States, 397 U.S. 1008, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970); United States v. Cianchetti, 315 F.2d 584, 591 (2d Cir. 1963); United States v. Martel, 17 F.R.D. 326, 328 (N.D.N.Y.1954); Note, Discovery by a Criminal Defendant of His Own Grand-Jury Testimony, 68 Colum.L.Rev. 311, 315 and n. 28 (1968).

occupants, and while waiting for the other officers to arrive and assist him, Trooper Farrell resorted to the ruse of telling the three men he was looking for a hit-and-run car. The rear bumper was examined; and the three men and Trooper Farrell were in the two cars for about 15 to 20 minutes before James F. Hurley, the Sheriff of Wayne County, and Lieutenant Edwin R. Krueger of the Newark Police Department arrived. During this interval neither Ayers nor his co-defendants made any statement to Farrell, and Farrell did not undertake any search of the automobile. Farrell acted merely as a custodian until Sheriff Hurley and Lieutenant Krueger arrived, and Sheriff Hurley then immediately placed the men under arrest. They then were searched and handcuffed and brought back to the Newark police station.

Even if Trooper Farrell had arrested the three men he, as a prudent man, would have had probable cause to make the arrests by reason of the message he received. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States v. Johnson, 403 F.2d 1002 (6th Cir. 1968); cf. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Lovell v. Henderson, 386 F.2d 257 (6th Cir. 1967). But the fact that no arrest was made until the arrival of Sheriff Hurley has no significance.

After the arrest there was no impropriety in searching the men. Having just tossed out the manila envelope containing 80 of the identical counterfeit $20 bills, as the jury were entitled to find from the evidence, it is not strange that no counterfeit bills were found on the persons of the defendants. Genuine money was found on each: Hadden, $6.-48; Kearney, $17.28 and Ayers, $120.61, which the jury might have found of some significance.

There was a cursory search of the car at the time of the arrest and a more thorough search 2 or 3 days later. The results were: the birthday charm purchased at Brenner's Jewelry Store, a brown paper bag containing a birthday card, envelope and a Woolworth Co. sales slip, evidently representing the purchase by Kearney when he came into the store to get the lay of the land just after Hadden had left without waiting for his change, leaving the three cups of coffee and the can of Alberto VO-5 hair spray he was about to purchase.

The first search was properly made in the course of the arrest of the 3 defendants, with ample probable cause, and the second pursuant to the provisions of 49 U.S.C. Sections 781 and 782, as the officer had probable cause to believe that the vehicle had been used to transport counterfeit federal reserve notes. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. Francolino, 367 F.2d 1013 (2d Cir. 1966), cert. denied, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967).

The detention of Ayers and his co-defendants was not based on suspicion but on the license number of the car copied down after Kearney entered it and the counterfeit $20 bill. Therefore, Ayers' motion to suppress the card and charm was properly denied.

We have no doubt 'of the sufficiency of the evidence to support the conviction of Ayers on both the Third and Fourth Counts of the indictment. We have considered appellant's other points, and we find no merit in any of them.

Affirmed.