**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leo SPANOS, Defendant-Appellant.**

**No. 71–2342.**

United States Court of Appeals,
Ninth Circuit.

May 4, 1972.

Rehearing Denied Aug. 21, 1972.

---

Edward L. Cragen (argued), San Francisco, Cal., for defendant-appellant.

Larry S. Flax, Asst. U. S. Atty. (argued), Eric A. Nobles, Asst. U. S. Atty., William D. Keller, U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before MERRILL, DUNIWAY and KILKENNY, Circuit Judges.

DUNIWAY, Circuit Judge:

Spanos appeals from a judgment of conviction under an indictment charging him with conspiring (18 U.S.C. § 371) with one Godwin and others to violate former 21 U.S.C. § 331(q) (2) and (3), (added by Pub.L. 89–74, § 5, 79 Stat. 226, 232, repealed by Pub.L. 91–513, § 701(a), 84 Stat. 1236, 1281) which prohibited sale and possession of certain stimulant drugs (21 U.S.C. § 511(b) and (c) as they read prior to their repeal by Pub.L. 91–513, *supra*, § 1101(a) (10)). This case is kept alive by §§ 702

(a) and 1103(a) of Pub.L. 91–513. We reverse.

What happened here is an abuse of the conspiracy charge; the government failed to prove its case. There was a good case for convicting Spanos for one unlawful sale of amphetamines at San Carlos, California, in the Northern District of California. One reason for the conspiracy charge was to place the offense in the Central District of California, where the case was tried. Many years ago Judge Learned Hand in United States v. Peoni, 2 Cir., 1938, 100 F.2d 401, 403, warned against just this sort of abuse. In a case in which the defendant was charged as an accessory and as a conspirator, he said:

"The oppression against which the Sixth Amendment is directed could be easily compassed by this device, because if the seller be a real accessory he may be removed to the place of the crime. Hoss v. United States, 8 Cir., 232 F. 328, 335; United States v. Littleton, D.C., 1 F.2d 751.

"The same reasoning applies to the conspiracy count. . . ." [1]

The conspiracy here charged is as follows:

"Beginning on or about October 21, 1969, and continuing to March 9, 1970, in the Central District of California, and elsewhere, defendant LEO SPANOS, and unindicted co-conspirator Rodney Francis Godwin, and other conspirators both known and unknown to the Grand Jury agreed, confederated, and conspired together to commit offenses against the United States in violation of Title 21, United States Code, Section 331(q) (2) and 331(q) (3), to wit:

1. to sell stimulant drugs contrary to law;

2. to possess for sale stimulant drugs contrary to law.

---

[1]. The pertinent language of the Sixth Amendment reads:

"In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. . . ."

The objects of said conspiracy were to be accomplished as follows:

Defendant LEO SPANOS would supply unindicted co-conspirator Rodney Francis Godwin with amphetamine tablets whenever Godwin located a buyer or buyers. When Godwin located a buyer or buyers he would contact LEO SPANOS and a meeting would be arranged at which time Godwin would receive the amphetamine tablets from LEO SPANOS. Godwin would then deliver the drugs to the buyer or buyers."

There follows a list of six overt acts.

The Supreme Court has held that before the extrajudicial statements of a co-conspirator can be considered as evidence against a defendant, the government must establish by evidence, restricted to proof *aliunde,* that the conspiracy existed. Glasser v. United States, 1942, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680. The test, under our interpretation of the rule in Carbo v. United States, 9 Cir., 1963, 314 F.2d 718, is whether the independent evidence makes a *prima facie* case, "one which would support a finding". *Id.* at 737. This means substantial independent evidence of the conspiracy charged.

When this limitation is imposed on the record in this case, the evidence which remains, when fairly considered, is insufficient to make out *prima facie* proof of the charged conspiracy. The *testimony* (as opposed to *extra-judicial statements*) of Godwin, the co-conspirator, and the other evidence, that can be claimed to tend to support a finding that the charged conspiracy existed consists of the following:

1. *The October 1969 sale, Godwin testifying.*

Godwin bought 50,000 amphetamine tablets from Spanos in San Carlos.

2. *The November 4, 1969 incident, Godwin testifying.*

Godwin flew to San Francisco with narcotic agent Ozment and others. He left Ozment at a restaurant in San Carlos and went alone to Spanos' house. "We talked and he [Spanos] didn't have anything, so I [Godwin] didn't make a deal for the pills." Godwin went there to attempt to get 100,000 pills. He had made "the arrangements" by phone. He and Spanos, at the latter's house, just disagreed about the pills, the method of the purchase, and he left.

3. *The November 19, 1969 incident.*

a. *Godwin's testimony.*

About three days before, he arranged with Spanos by phone to "get some whites." Spanos said he could. On November 19 Godwin, Ozment, and a pilot flew to San Carlos in a chartered plane. They rented a car, and Ozment and the pilot were left at a restaurant. Godwin went to Spanos' house and asked Spanos for "whites." Spanos refused. Godwin told Spanos that Spanos would have to tell "the people" himself, and that Godwin would introduce them. Godwin went back to the restaurant. Then Spanos arrived and Godwin introduced him to Ozment, and Spanos and Ozment conversed. Godwin did not recall the conversation.

b. *Ozment's testimony.*

"Q. What was the substance of that conversation?

A. We discussed the previous purchase and I told him that we liked the merchandise we had gotten before. He said, in effect, this merchandise is the same as the last time, it has the labels on it like the others you got, and then he told me he didn't want to do any business at that time because he knew he was being followed, and then he started to leave."

4. *Other direct evidence relating to Spanos.*

a. *Agent Herring testifying.*

On November 26, 1969, at Godwin's home, Godwin telephoned Spanos.

"He [Godwin] did ask to speak with Leo [Spanos], and part of the conversation that I heard was, well, are you going to do any business at all or not, for how long, Tuesday, okay, then I will be in touch. The conversation was then ended."

Herring had no more dealings with Godwin, much less with Spanos.

b. *Godwin testifying.*

In October, 1969, he had known Spanos for about a year and a half. · On occasions, he had been buying pills from Spanos. He flew to San Carlos on occasions to get them.

c. *Agent Clark testifying.*

On November 19, 1969, he saw Ozment meet Spanos at the restaurant in San Carlos.

Apart from the considerable damaging testimony by agents Herring and Ozment about what Godwin said Spanos said and did, that is all the evidence there is that connects Spanos with the charged "conspiracy." It is not enough to make a *prima facie* case.

It is important, in considering this evidence, to remember the nature of the charged conspiracy, which is that Godwin, Spanos and others agreed, within the Central District of California, that Spanos "would supply Godwin . . . whenever Godwin located a buyer or buyers" and that, "When Godwin located a buyer or buyers he would contact . . Spanos and a meeting would be arranged at which time Godwin would receive the amphetamine . . . from Spanos. Godwin would then deliver the drugs to the buyer or buyers."

Godwin sold the pills that he bought in October to Herring, but there is no evidence that Spanos had agreed with Godwin that Godwin was to resell to Herring or to anyone else. This does not show the charged conspiracy, even *prima facie.* The November 4 incident proves even less. It shows only an unsuccessful attempt by Godwin to buy pills from Spanos. For all that appears, "the arrangements" may have been only to meet, rather than to buy and sell. The November 19 incident is strikingly similar. However, this time, before Godwin went to San Carlos he asked Spanos, by telephone, if he could "get some whites" and was told that he could. So far as appears, all that Spanos learned from Godwin's advance phone call was that Godwin wanted to buy; he did not learn that Godwin had located a buyer. But when Godwin arrived, Spanos refused to sell. So far as the pertinent evidence shows, it was only on November 19 that Spanos learned that Godwin had resold any pills, or that Ozment or someone associated with him had bought the pills that Spanos sold to Godwin in October. He also learned that Ozment wanted more. What happened? Spanos refused.

There is much evidence about meetings between Godwin and narcotics agents in Southern California, and the arrangements between them for trips to San Carlos. Thus Godwin and the agents were busy conspiring. But there is no evidence other than hearsay that Spanos was a part of that conspiracy, assuming that it was charged, which it was not.

In United States v. Peoni, *supra,* Peoni sold counterfeit bills to Regno and Regno re-sold them to Dorsey, who tried to pass them. Each of the three knew that the bills were counterfeit. Peoni was charged with conspiring to have Dorsey pass the bills. He was convicted, but on appeal the conviction was reversed. Judge Learned Hand said:

*"Assuming that Peoni and Regno agreed that Regno should have possession of the bills, it is absurd to say that Peoni agreed that Dorsey should have them from Regno.* Peoni knew that somebody besides Regno might get them, but a conspiracy also imports a concert of purpose, and again Peoni had no concern with the bills after Regno paid for them. At times it seemed to be supposed that, once some kind of criminal concert is established, all parties are liable for everything anyone of the original participants does, and even for what those do who join later. Nothing could be more untrue. Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it. The confusion is perhaps due to the fact

that everything done by the conspirators—including the declarations of later entrants—is competent evidence against all, so far as it may fairly be thought to be in execution of the concert to which the accused is privy, though that doctrine too is often abused." (100 F.2d at 403) (Emphasis added.)

Nothing in the cases cited to us supports a claim that *Peoni,* as analyzed in United States v. Ragland, 2 Cir., 1967, 375 F.2d 471, 477, does not fit our facts or is no longer a controlling precedent, except in the very narrow field to which it directly applies, whatever that may be thought to mean. The only reference to *Peoni* in *Ragland* appears at 375 F.2d at p. 477. There, Judge Waterman quotes from *Peoni,* with apparent approval, the following:

"The accused must 'in some sort associate himself with the venture, * * * participate in it as in something that he wishes to bring about * * * [or] seek by his action to make it succeed.'"

No other case is cited to us to support the argued characterization of the status of *Peoni.*

■ Moreover, Spanos' case does fall within the very narrow field to which *Peoni* directly applies, if that language means anything. The charged conspiracy is that Godwin was to find buyers, then get the pills from Spanos and deliver them to the buyers. The proof is only that Godwin bought from Spanos, then tried twice to buy again and was refused. The proof is similar to what was proved in *Peoni,* and was there held insufficient. It certainly does not make out a *prima facie* case of the conspiracy charged.

Also in point is United States v. Cianchetti, 2 Cir., 1963, 315 F.2d 584, 587. There, there was a substantial conspiracy to import heroin into the United States and sell it. The conspirators needed a new outlet and Cianchetti was approached. He met with some of the conspirators, displayed considerable knowledge of the conspiracy, and discussed the difficulties of selling heroin once it was imported. He then, because he was already in trouble with the law, declined to participate. He did agree to a second meeting, at which he again refused to participate. After further talk, he said he might be able to help, but the conspirators never heard from him again. He was convicted as a member of the conspiracy. On appeal, the court said:

"Appellant Cianchetti, for purposes of this appeal, does not contest the Government's proof that a conspiracy existed or that Cianchetti had knowledge of its operations. He argues, however, that there was insufficient evidence to warrant the conclusion that he entered, participated in, or furthered the conspiracy. We agree, and we therefore reverse his conviction and dismiss the indictment as to him.

There is little doubt that Cianchetti knew of the Marseilles group, for he admitted to Warycha in their conversation in September 1960 that he had known the Arancis for thirty years and that they had offered him large quantities of heroin; moreover, he discussed with Warycha the problems of distribution and of securing prompt and full payment. But knowledge of the existence and goals of a conspiracy does not of itself make one a coconspirator. . . .

Rather than revealing a stake in the conspiratorial venture or an affirmative attempt to further its purposes, Cianchetti's statements of his intention were at least equivocal, at most clearly disclamatory. . . .

Neither we nor the District Court sits in judgment of an individual's reasons for abstaining from an agreement to commit a crime. Cianchetti's motives may not have been wholly laudatory [sic], but the fact remains that the evidence shows that he did indeed abstain. He did not cast in his lot with the conspirators, did nothing to further the success of the enterprise, and had no stake in its outcome. His

conviction must be reversed." (Pp. 587–588.)

The parallel between Cianchetti's behavior and Spanos' is striking, especially on November 19 and in the November 26 phone call.

It is true that the *Peoni* and *Cianchetti* cases deal with the sufficientcy of evidence to support a jury verdict, not the sufficiency of evidence to make out a *prima facie* case under *Carbo*. But they did not involve what we have here, an extensive use of Godwin's out of court statements, not testified to by Godwin at the trial, to bolster a supposed *prima facie* case and thus turn it into proof beyond a reasonable doubt. They deal with the type of behavior and knowledge that is evidence of a conspiracy at all. Thus, the principles they apply are also applicable here. Like Peoni, Spanos sold, presumably knowing that Godwin would probably resell; like Cianchetti, Spanos refused to make further sales, when for the first time (so far as the evidence shows) he learned the extent of Godwin's sales and to whom he was selling. His motives, like Cianchetti's, were not laudable, but as *Cianchetti* holds, that is immaterial.

This case also falls within the principles laid down by the Supreme Court in Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674. There, on evidence far stronger than in this case, the Court found that the conspiracy had been proved, but in doing so it laid down careful limitations on the conspiracy doctrine:

> "There may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken. Concededly, not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." [*Id.* at 712.]

In a footnote to this passage the Court also stated:

> "This may be true, for instance, of single or casual transactions, not amounting to a course of business, regular, sustained, and prolonged, and involving nothing more on the seller's part than indifference to the buyer's illegal purpose and passive acquiescence in his desire to purchase, for whatever end. A considerable degree of carelessness coupled with casual transactions is tolerable outside the boundary of conspiracy. There may be also a fairly broad latitude of immunity for a more continuous course of sales, made either with strong suspicion of the buyer's wrongful use or with knowledge, but with stimulation or active incitement to purchase." [*Id.* fn. 8.]

The foregoing is a good description of what the evidence *aliunde* shows here. There is no doubt that the government could have charged Spanos with the October sale, but it did not. The government did not prove, even *prima facie*, what it charged; we cannot sustain the conviction because the government proved what it did not charge.

The judgment is reversed, with instructions to dismiss the indictment.

MERRILL, Circuit Judge (concurring):

I concur in Judge Duniway's opinion but wish to add a thought of my own with respect to conspiracies of the sort we face here.

The conspiracy for which the Government contends is founded not on an agreement between Spanos and Godwin that the latter would sell to Ozment or Herring, but rather on a business relationship and course of dealing from which an agreement respecting resales may be inferred. Because of that relationship and inferred agreement Spanos is charged with conspiratorial responsibility for Godwin's sale of 50,000 amphetamine tablets to Agent Herring. In order thus to hold him responsible, it is not enough that resale was foreseeable. If an agreement respecting resales is to be inferred it must appear that Spanos to some extent shared Godwin's interest in such transactions.

The record below (absent the questioned declarations), in my view fails to make out a prima facie case of such a relationship. To me it indicates quite the contrary. Godwin was not shown to be one of those retailers on whom the success of Spanos' dealership depended. During a period of a year and a half he had "occasionally" dealt with Spanos. He had access to Spanos, but that was about all he could claim. That Spanos felt any incentive to retain Godwin as a desirable commercial outlet seems to me to be persuasively disputed by the very manner in which the story apparently ends—with Godwin's final telephone call to Spanos, as overheard by Herring: "Are you going to do any business at all or not, for how long, Tuesday, okay, then I will be in touch." So far as we know that was the end of the matter.

From this careless finale (preceded by two unsuccessful attempts to do business) I would conclude that Spanos did not share any interest in Godwin's resale activities and cannot be held responsible for them.

KILKENNY, Circuit Judge (dissenting):

INDEPENDENT EVIDENCE

Godwin, an unindicted co-conspirator who had been dealing in illegal drugs for a number of years, testified for the government. His testimony is summarized as follows: Prior to October, 1969, he had been acquainted with appellant for a period of approximately one and one-half years and during that period of time he had occasionally made trips to the San Francisco area and purchased "pills"[1] from appellant. Godwin resided in the Central District of California. Appellant resided in San Carlos, near San Francisco, in the Northern District of California. Generally, Godwin commuted between the Los Angeles area and the San Francisco area by plane. All advance arrangements for purchase of the "pills" were made by telephone. In October, 1969, Godwin made an arrangement with appellant to purchase 50,000 amphetamine tablets. He made the trip to San Carlos and accepted delivery of the pills at appellant's home. By prearrangement, these pills were sold by Godwin to government undercover agent Herring for $2,000.00. The sale was made in the Los Angeles area. This trip was made by private plane.

On November 4, 1969, after a telephone arrangement, Godwin made another trip by private plane from the Los Angeles area to the San Francisco Bay area with undercover agent Ozment to pick up 100,000 "pills". Godwin left the agent at a restaurant and went to appellant's home in San Carlos to obtain the pills. Delivery was not made on account of disagreement as to the financial arrangements or purchase price.

On November 19th, by pre-arrangement, Godwin again flew to San Carlos with undercover agent Ozment and another. He left Ozment at a restaurant and drove to appellant's home. Appellant said that he did not then have the 100,-000 whites as ordered by phone three days previously. This provoked Godwin and he told appellant that he was tired of running back and forth and that appellant would have to personally explain to Godwin's purchasers, who were waiting in the restaurant. They drove to the restaurant and there appellant was introduced to Ozment. Godwin did not recall the details of the converstaion. Ozment testified that appellant took him outside and pointed out several parked cars which he thought were "following me". They had a conversation in which Ozment told appellant that he had made the previous purchase and liked the merchandise. Appellant responded by saying that the merchandise he then had for sale was the same as the last time, carrying the same labels, but that he did not want to do business at that time because he knew he was being followed.

Later, on November 26th, the agent Herring was present at Godwin's home

1. Amphetamine Tablets.

when Godwin again called appellant and asked if he was going to do any more business and for how long. They agreed to talk again on the following Tuesday. During all this period agent Herring was playing the role of a large narcotics dealer in Los Angeles, while agents Ozment and others were playing the role of acting as Herring's bodyguards.

The above establishes, either directly or in the circumstances of the case, that: (1) Godwin, the co-conspirator, was a dealer in illegal drugs; (2) appellant was a dealer in illegal drugs; (3) that appellant and Godwin had known each other over a year and a half; (4) that appellant was at least one of Godwin's suppliers; (5) that appellant knew that Godwin was selling the drugs in the Los Angeles area; (6) that the relationship between appellant and Godwin was a continuing one; (7) that the quantity of drugs involved required appellant to know that Godwin was disposing of them to third persons. Common sense teaches that Godwin and the undercover agents would not have been flying back and forth between the Los Angeles and San Francisco area if some definite arrangement did not exist between Godwin and appellant.

## CONCLUSIONS

The principal thrust of the majority opinion is that the evidence implicating appellant independent of Godwin's extrajudicial declarations, is insufficient to establish the concert of action between appellant and Godwin necessary to authorize the admission of the declarations. It is well settled that once a concert of action is independently shown, Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), hearsay statements made in furtherance of the relationship are admissible.

At the outset, it was the judge's duty to determine the admissibility of the declarations. In making this determination, the test is not whether appellant's connection with Godwin had, by independent evidence, been established beyond a reasonable doubt, but whether ac-cepting the independent evidence as credible, the judge was satisfied that a prima facie case had been made. Subsequently, it is the function of the jury to decide whether the evidence, including the declarations, is credible and convincing beyond a reasonable doubt. Carbo v. United States, 314 F.2d 718, 736–737 (9th Cir. 1963).

The participation in the venture which a conspirator wishes to bring about, or seeks by his action to make succeed, as outlined in United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938), upon which appellant relies, may be shown by possession of the subject matter of the illegal transactions, plus participation in the proceeds thereof. This is made clear in United States v. Ragland, 375 F.2d 471, 477 (2d Cir. 1967), in which Peoni is placed in proper perspective, and Carbo is cited with approval. Ragland emphasizes that an otherwise innocent act of a relatively slight moment may, when viewed in the context of surrounding circumstances, justify an inference of complicity. Ragland, supra, 375 F.2d p. 478. In speaking of Judge Hand's decisions on the subject, the Second Circuit in United States v. Geaney, 417 F.2d 1116, 1119 (1969), said:

"What has been left in some doubt, both in Judge Hand's opinions and in later ones for this court, is the quantum of such evidence that will suffice. In United States v. Ross, 321 F.2d 61, 68 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963), we said, in an opinion by the writer, that 'the amount of proof *aliunde* as to the existence of a conspiracy that is required to render such evidence admissible is not as high as the amount needed to warrant submission of a conspiracy charge to the jury'—without stating, however, just how 'high' it must be. And in United States v. Ragland, 375 F.2d 471, 477 (2 Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), Judge Waterman wrote that 'The threshold requirement for admissibility is satisfied by a showing of

a likelihood of an illicit association between the declarant and the defendant although it might later eventuate that evidence so admitted proves to be insufficient to justify submitting to the jury the issue of defendant's alleged guilty involvement with the declarant.' "

We recently held in United States v. Castanon, 453 F.2d 932 (9th Cir., Jan. 5, 1972), that circumstantial evidence is sufficient to establish a conspiracy. The same rule is stated in *Ragland, supra,* and Nelson v. United States, 415 F.2d 483, 487 (5th Cir. 1969). In United States v. Nelson, 419 F.2d 1237, 1239 (9th Cir. 1969), we adhered to the long established rule in this circuit that circumstantial evidence is not inherently less probative than direct evidence.

In my opinion, the direct and circumstantial evidence, including the inferences to be drawn therefrom, is clearly sufficient to establish a prima facie case of a conspiracy between appellant and Godwin to violate the law as charged in the indictment.

At first glance, Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), might seem to support appellant's position. However, what was said along that line is mostly dicta. The Supreme Court, in its final analysis, there held that there was sufficient evidence to establish a conspiracy.

United States v. Peoni, *supra,* as analyzed in *Ragland,* does not fit our facts and is no longer a controlling precedent, except in the very narrow field to which it directly applies. As emphasized in *Ragland,* Judge Hand's opinions [including *Peoni*] left in doubt the quantum of the evidence that would suffice as the basis for the introduction of hearsay testimony. In *Peoni,* Judge Hand was speaking of all the evidence, including the out-of-court declarations when he said, "The accused must 'in some sort associate himself with the venture, . . participate in it as in something that he wishes to bring about . . . [or] seek by his action to make it succeed.' "

If, as in *Peoni,* the out-of-court declarations of Godwin are here considered, there is no question but that appellant did associate himself with the venture, participate in it and by his actions attempted to make it succeed. Neither is United States v. Cianchetti, 315 F.2d 584 (2d Cir. 1963), of any help to appellant. There, the appellant displayed some knowledge of the conspiracy, met with some of the conspirators, discussed the problems in selling imported heroin and declined to participate because he was already in trouble with the law. He agreed to a second meeting, but again refused to participate. On the occasion of another meeting, he said that *he might be able to help,* but was never heard from again. Needless to say, that factual background cannot logically be compared with the one before us. Moreover, as I read the *Cianchetti* decision, the question of whether the evidence presented a prima facie case for the admission of extrajudicial statements was not involved. The issue there discussed was whether the evidence was sufficient to show guilt beyond a reasonable doubt, after trial by a jury.

A prima facie case having, I believe, been established, the out-of-court statements of Godwin implicating appellant in an agreed plan for the wholesale distribution of prohibited stimulant drugs in the Los Angeles area, as testified to by the undercover agents, are admissible. When supplemented with these statements, the evidence leaves no doubt of the appellant's guilt. I need not extend the record by outlining the substance of Godwin's out-of-court statements. Even appellant does not argue that the evidence is insufficient if the out-of-court statements are to be considered.

Appellant also contends that he was prejudically affected by the reference at trial to the co-conspirator's dealings in narcotics, such as heroin and cocaine. He argues that these drugs were not here involved and that the jury could well have been inflamed against him by hearing references made to those drugs. The record indicates that the co-conspirator

desired to get out of the amphetamine business and into hard narcotics. I have read the record pertaining to the issue and feel that the introduction of this evidence was within the confines of permissible procedure. It placed before the jury a complete picture of the co-conspirator's activities and background. Beyond that, a considerable part of the testimony concerning the co-conspirator's activities in narcotics was placed in the record by appellant's own counsel. At no time did the government infer that appellant was trafficking in heroin and cocaine. In these circumstances, the error, if any, was harmless within the meaning of Rule 52(a), F.R.Crim.P. Castro v. United States, 296 F.2d 540 (5th Cir. 1961) and Daily v. United States, 293 F.2d 33 (9th Cir. 1961) are readily distinguishable and do not deserve comment. Nor do I find anything in United States v. DeCicco, 435 F.2d 478 (2d Cir. 1970), which would require me to arrive at a different conclusion. Simply stated, appellant's cases are not in point.

The judgment appealed from should be affirmed.