UNITED STATES of America,
Plaintiff–Appellee,

v.

Elliott CAPLAN, Defendant–Appellant.

No. 79–1374.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1979.

Decided Dec. 1, 1980.

Norman R. Freeman, Tucson, Ariz., for defendant–appellant.

Jon R. Cooper, Tucson, Ariz., on brief; Rhonda L. Repp, Asst. U.S. Atty., Tucson, Ariz., argued for plaintiff–appellee.

Before KENNEDY, TANG and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

## I. PROCEDURAL BACKGROUND

Elliott Caplan, under the alias of Vernon Frank Mitchell, was charged by indictment in the District of Arizona on January 12, 1977 with conspiracy to possess marijuana with the intent to distribute and conspiracy to import marijuana in violation of Title 21, United States Code, §§ 841(a)(1) and 846, and §§ 952(a), 960(a)(1) and 963, respectively. On September 14, 1978, appellant's trial counsel made a motion requesting a psychiatric examination to determine appellant's competence to stand trial pursuant to 18 U.S.C. § 4244 [1] and to determine appellant's sanity at the time of the commission of the offense.[2] In part, the motion stated that "the defendant is presently being examined by Dr. Marshall Jones and Dr. Allan Beigal

---

1. Section 4244 reads in pertinent part:

    "Whenever after arrest and prior to the imposition of sentence ... the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused .... Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused ... to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court .... If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto ... "

2. While § 4244 is the statutory authority for a court to order a psychiatric examination to determine a defendant's competency to stand trial, it is not the source of a court's power to order an examination to determine the defendant's sanity at the time of the offense. Rather, the "source of the power to order such an examination is the inherent power of the court." *United States v. Malcolm*, 475 F.2d 420, 424 (9th Cir. 1973).

as a result of a Rule 11 motion filed and granted in Pima County Superior Court, and, therefore, their findings and reports might suffice for the purposes of this motion."[3] The prosecution also filed a motion on October 11, 1978, expressing doubt as to appellant's competency to stand trial and requesting that the court consider the two psychiatric reports referred to in appellant's motion. Accordingly, on October 13, 1978, a hearing was held to determine appellant's competency to stand trial. Based upon the

evidence submitted, the court found appellant incompetent to stand trial and vacated his trial date.[4]

Pursuant to an order of the Pima County Superior Court dated October 30, 1978, appellant was committed to the Arizona State Hospital as incompetent to stand trial on the state charges. During this commitment, appellant was subjected to psychiatric evaluation. A psychiatric examination report prepared for the Pima County Superior Court was forwarded to the United

3. Rule 11 of the Arizona Rules of Court, entitled "Incompetency and Mental Examinations," provides a procedure similar to § 4244 for the determination of competency to stand trial.

4. These proceedings were conducted as follows:

"THE COURT: The record may show that Mr. Caplan is present.

MR. MUELLER: Your Honor, the Government has had marked two letters I have received from Mr. Jensen [defense counsel] this morning. One is from Dr. Jones and one is from Dr. Beigel. They are in regard to the examination they conducted pursuant to a State court order, the examinations of the Defendant with regard to his competency to stand trial at the present time. I believe it is the conclusion of each of the doctors that the Defendant is not competent to stand trial. I believe defense counsel, Mr. Jensen, has agreed to stipulate that these two reports may be admitted in evidence for your consideration at this hearing.

THE COURT: Is that correct?

MR. JENSEN: Yes, it is, your Honor.

THE COURT: They may be admitted as Government's Exhibit 1 and 2.

Is Mr. Caplan a federal prisoner or a state prisoner?

Mr. Mueller: I am not certain, your Honor, I believe he was originally arrested on a state charge. I am so new to this case that I am not clear on that.

MR. JENSEN: He is both a state and a federal prisoner at the current time.

THE COURT: What is the status of the case in state court?

MR. JENSEN: It is approximately at the same stage of development as it is here, your Honor. I will be doing similar motions in state court under Rule 11, competency to stand trial.

MR. MUELLER: When will it be held?

MR. JENSEN: I should have something in next week.

THE COURT: He may be both a state prisoner and a federal prisoner but who got him first. Does the Marshal know that?

THE MARSHAL: I believe he is here on a writ, your Honor.

THE COURT: If he is on a writ, the state has custody of him and that makes a difference in the final determination in this matter as to the situation.

Based upon the letters which you have indicated, I notice it states that he isn't competent to stand trial, I will make a finding at this time that the Defendant is presently mentally incompetent to stand trial; that he will not be able to aid his counsel in his defense or understand the nature of the proceedings against him.

I will reserve any further ruling in the matter until you have had your state court hearing because if he is in state custody primarily, we will wait to see what their determination is as to whether or not they are going to require hospitalization or not.

I will also vacate the trial date presently set for October 17th to be reset at a later time if it is determined the Defendant is competent to stand trial.

It might be this Court will decide that he should be turned over to some type of an institution, but I think it is the state's position to go first on that because they have the primary custody of Mr. Caplan and he is only being brought here on a writ. I don't think we could do anything, as a matter of fact.

MR. MUELLER: That is agreeable with the Government, your Honor.

THE COURT: Is that agreeable with you, Mr. Jensen?

MR. JENSEN: Yes, your Honor.

THE COURT: Who is the state Judge? I know Judge Arnold started it.

MR. JENSEN: That is where I applied for the Rule 11.

THE COURT: I am going to request that you notify me immediately after the Rule 11 hearing as to what the results were, and you notify Mr. Mueller also because the federal hold is still on him.

If they should order that he go to a hospital, or something like that, we will have to withdraw our hold to allow him to go. It might work vice versa."

States District Court of the District of Arizona. This evaluation was received by the federal court on March 7, 1979. An order was entered on March 16th by United States District Judge Mary Anne Richey stating that all pending matters in appellant's case would be heard before the Honorable Robert C. Belloni on March 26, 1979 and that the trial date would be set for March 29, 1979 before the same judge.

On March 26, 1979 Judge Belloni heard and granted appellant's motions for disclosure of the Grand Jury transcript and for a Bill of Particulars. He also set the trial to begin the afternoon of March 28th instead of the morning of the 29th.

The court's attention then turned to the matter of appellant's present competency to stand trial:

"THE COURT: The Clerk tells me that you wish to discuss the competency matter.

MR. JENSEN [defense counsel]: The Clerk brought it up to me, your Honor, or to us, that no formal determination I believe of the Defendant's competency has been made in this Court. One has been made, I believe, in state Court.

THE COURT: That he is incompetent__that he is competent to stand trial____

MR. JENSEN: Right, in state Court.

THE COURT: __and assist in his own defense?

MR. JENSEN: At the time it was made, your Honor.

THE COURT: I have the____

MR. JENSEN: I beg to differ with it, but then I__considering the Defendant's medical background and the various institutions he's been in, he's been in solitary confinement in St. Peters Institution for 23 days. That didn't do him much good. He's been in confinement at various other places, and he's been seen by various other psychiatrists and counseling personnel for three years.

Irrespective of what the state Court has said based on here and the state hospital, I would submit that there's some doubt as to the Defendant's competency.

THE COURT: Well, I think what the Clerk said, and I agree too, if there's a competency matter to be raised, it should be raised now rather than the last minute.

MR. JENSEN: I agree, your Honor.

THE COURT: I have read a sealed report of Dr. Michael F. Cleary of the Arizona State Hospital. Have you had a chance to see it?

MR. JENSEN: I have it. Not today, your Honor, but I have____

THE COURT: But you have seen it?

MR. JENSEN: Yeah. A copy was sent to me.

THE COURT: Okay. Well, are you agreeable that the Court can consider this report?

MR. JENSEN: I would__I have no objection to being submitted to that doctor, and that report would have to be____

THE COURT: All right.

MR. JENSEN: __considered, as much as I beg to differ with it, your Honor.

THE COURT: Certainly. Well, his conclusion seems to be that there simply is no__that there is no mental defect and that he is competent to stand trial. And I also find that he is competent to participate in the proceedings and to assist in his own defense. So having that out of the way, then it will not have to be brought up at the last minute.

Is there anything else?

MR. JENSEN: No, your Honor.

MR. COOPER: No, your Honor.

THE COURT: All right."

The proceedings were adjourned. Trial began on March 28th and concluded on March 29th, when the jury brought in a verdict of guilty on each count charged.

## II. THE PROSECUTION'S EVIDENCE

The prosecution's case against appellant was based primarily upon the testimony of Alma Waits. Waits was indicted as a co-conspirator, pled guilty, and cooperated with the prosecution in testifying against

appellant. According to her testimony, Waits took over her husband's marijuana business in January, 1976 when he was sentenced to serve a prison term. Waits first dealt with appellant in February, 1976 through a middleman. However, the middleman was quickly eliminated and Waits began dealing with appellant directly.

In July, 1976, Waits contacted appellant to ask if he wanted to purchase marijuana. During negotiations, which took place at Waits' "stash house," [5] appellant expressed his dissatisfaction with the small quantity and high price of the particular marijuana that was available. Waits explained that things were tight at the border and that her Mexican suppliers were having difficulty getting the marijuana into the United States. Appellant advised her that she should "push harder." Subsequently, appellant met with Waits' Mexican suppliers directly in late July or early August, 1976. A large quantity of marijuana had already been delivered to appellant. He had not paid Waits for it, so she had not yet paid the suppliers. Nonetheless, appellant attempted to persuade the suppliers to deliver more and offered to pay for the total amount when the additional contraband was received. The Mexican suppliers told appellant that they could not purchase more marijuana to bring across the border until they had been paid for that which they had already delivered. These negotiations went on for two or three days.

Another sale, for approximately 200 pounds of marijuana, was negotiated in August, when appellant again met with the Mexican suppliers to argue over the price, quality and quantity of the shipment. He complained that the marijuana had too many sticks and seeds and that his people back east would not like it. Appellant, nonetheless, purchased the full 200 pounds offered.

In what was apparently their last transaction, Waits delivered a quantity of marijuana to appellant in Oklahoma City around the beginning of December, 1976, on the understanding that appellant would pay her for it when he had resold it in the east. Appellant subsequently paid for the marijuana by mail with three separate Western Union Moneygrams. This method of payment had been used on at least one other occasion when, according to Waits' testimony, she advanced a quantity of marijuana to appellant without payment so that he could sell it in the east.

## III. APPELLANT'S CONTENTIONS ON APPEAL

Appellant Caplan appeals from the judgment on three grounds: (1) the court failed to act on his motion for a psychiatric examination to determine his sanity at the time of the commission of the offense; (2) the court failed to hold an evidentiary hearing to determine whether his competency to stand trial had been restored; (3) there was insufficient evidence upon which to convict him of conspiracy to either import, possess or distribute marijuana.

1. *Propriety of Disposition of Motion for Psychiatric Examination to Determine Sanity*

■ Appellant contends that the trial court erred in failing to appoint a psychiatrist to determine his sanity at the time of the offense as requested in his motion. He correctly points out that competency to stand trial and mental condition at the time of the charged offense are separate and distinct issues. *Jackson v. Indiana*, 406 U.S. 715, 739, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). As noted above, when appellant's counsel initially moved for an examination to determine appellant's competency to stand trial, he also requested that appellant's mental condition at the time of the offense be determined. Based on state medical reports, the district court found

---

**5.** According to Waits, her "stash house" was a house away from her own residence where she kept quantities of marijuana prior to sale. The house was lived in rent–free by one or two men in exchange for their protection of the marijua-

na. Waits testified that appellant usually stayed at one of her stash houses when he was in Tucson to buy marijuana from her. Later negotiations discussed below also took place at such a stash house.

that appellant was incompetent to stand trial. After further evaluation in a state mental hospital revealed that appellant was now incompetent and that his suspicious attitude towards society did not seem to result from any specific mental disorder, the district court ruled that appellant was competent to stand trial and to assist in his own defense. Appellant did not renew his motion for an examination to determine his sanity at the time of the offense after he was found competent to stand trial. By failing to do so, he effectively abandoned his request.[6] Further, appellant did not rely upon a defense of insanity at his trial. The defense's case consisted entirely of cross–examination of the prosecution witnesses. Had trial counsel intended to interpose an insanity defense on appellant's behalf, he would have been required to notify the government in writing of such intention and file a copy of such notice with the clerk. If there is a failure to give such notice, insanity may not be raised as a defense. Rule 12.2, Fed.R.Crim.P. Appellant clearly waived an insanity defense by failing to pursue the determination of his sanity at the time of the offense by psychiatric examination and by failing to comply with Rule 12.2. Therefore, the failure of the trial court to order an examination of his sanity at the time of the commission of the offense cannot now be argued as a ground for reversal.

## 2. Necessity for Evidentiary Hearing to Determine Competency

██ Appellant argues that a prior judicial determination of incompetency is sufficient as a matter of law to raise a doubt as to present competency and to require automatically that an evidentiary hearing be held before criminal proceedings on the issue of guilt can be resumed. This argument, however, is foreclosed to appellant by our recent holding in *United States v. Clark*, 617 F.2d 180 (9th Cir. 1980). There we held that when a defendant has been committed as incompetent under 18 U.S.C. §§ 4244 and 4246 and has been returned to court as competent by the commitment institution, a second competency hearing is not automatically required. *Id.* at 184. Instead, whether a hearing is required will depend upon the facts of the particular case. *Id.*

Our task, then, in deciding whether a hearing is required, is to determine whether there is "substantial evidence" that the defendant may be mentally incompetent to stand trial. *See Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972). As we indicated in our review of the evidence in *Clark*, evidence of past incompetency may be relevant in determining a defendant's present competence to stand trial. *Clark*, 617 F.2d at 184. This is consistent with *Clark's* reasoning that the necessity for an evidentiary hearing depends on the facts of a given case. Mechanical application of a rule that considers only the most recent report to be evidence of present incompetence could lead to the exclusion of highly probative evidence of present incompetence that may be contained in past reports. It takes little imagination to hypothesize a grossly unjust situation such a rule might create where there are detailed psychiatric reports of past incompetence followed by a single sketchy report of competence.

Of course, the probative value of past reports may dissipate over time. The court, therefore, having received a report of present competence, must reassess the quality of past evidence. It should consider, inter alia, the detail and thoroughness of the prior reports, the seriousness of illness reported, and the prognosis, if any, for future recovery. *Cf. Clark*, 617 F.2d at 186 (importance of prior reports diminished where psychiatrist expressed opinion that competency would return within reasonable time). Besides past reports, other factors for consideration could include the time elapsed for treatment, the opportunity to

---

**6.** A request for a psychiatric examination to determine an accused's sanity at the time of the offense may continue to be of strategic value despite the fact that he has been found to be incompetent to stand trial. It is possible that a determination of his sanity at the time of the offense could be made more readily at a time less remote from the offense than at some future time after competency to stand trial has been regained.

study the defendant during the time of treatment or commitment, and the court's own observation of the defendant. Although the ultimate report in which the defendant is found competent may often be the most probative information, that report must be carefully evaluated and weighed in light of the importance given to all other relevant indicia of the defendant's present mental health.

Based on the record presented to the district court, we conclude that the court did not err in denying an evidentiary hearing. The district court had before it the February 22, 1979 report of the psychiatrist at the Arizona State Hospital. That report, following a period of hospital care and treatment, revealed that, in the opinion of that psychiatrist, appellant was now competent to stand trial.[7]

In contrast, as evidenced in the passages of the transcript quoted previously, counsel for Caplan failed to offer any evidence of present mental incompetence to the district court other than generalized references to Caplan's medical history. He did not state that he was unable to communicate with appellant or that appellant was unable to cooperate in his defense. He did not even refer to the earlier reports of Dr. Jones and Dr. Beigel finding Caplan incompetent.[8] Even if we assume that the district court

---

7. In his psychiatric examination report, Dr. Cleary concluded that:

"The patient is aware of time, place and person. His memory and concentration are adequate. His affective tone and responses generally are felt to be within normal limits and when he does behave in a bizarre way it is felt that this is a purposeful control response. There is no indication at this time that he is having any hallucinatory experience. He describes himself as paranoid, but what this comes down to is that he is somewhat suspicious of other people and their motives and feels, especially when confined, that he should not trust people. He accepts that this attitude can be a two-way street, but it does not necessarily imply any mental disorder.

The patient's responses in general are clear and coherent. His vocabulary is adequate and is consistent with his level of education. There is no indication of blocking, disorganization, or looseness of thinking and his thought content is not suggestive of any unusual obsessions or preoccupations. The patient's attitude toward society appears to be that he can make a living easily without taking on too many responsibilities, such as marriage, regular employment or paying taxes. While he has been in conflict with the law, he insists that, with one exception, he has not been violent and does not present a danger.

Why the defendant has elected to live the way he has done for the past fifteen years is a matter of conjecture. However, it does not seem to result from any specific mental disorder.

Diagnosis: Personality Disorder, Antisocial Personality

It is felt that the patient's medication can be further reduced and that within a week or ten days he can discontinue all drug therapy and can be returned to court shortly. He is, in my opinion, competent to stand trial."

8. The report of Dr. Jones provides as follows:

"Elliott Caplean [sic] is a 30 year old man who was examined in my office on 8–31–78 under provisions of Rule 11. He is currently being held in custody in the Pima County Jail on charges of possession of marijuana and narcotic drugs (?) Mr. Caplean was extremely agitated and frightened in the interview situation, initially expressing fears of coming into my office because he thought that I might kill him. Because of his extreme distress he often would not give answers to my questions and consequently I obtained very little background information.

Mr. Caplean says that he has lived both in Tucson and Colorado and says he has worked briefly in bars teaching backgammon. He says that he has used drugs in the past primarily Qualudes because he feels they have been necessary to calm him down. He says he has used psychodelic drugs but denies any use of opiates. He indicated he had been in psychiatric hospitals in the past but gave little information about that although he did say that recently he was in Kino Hospital. Apparently he has been living with a woman for four or five years and he says that she is on probation for some reason, probably related to drug charges.

In the interview situation, Mr. Caplean said that he was not Elliott Caplean, that Elliott Caplean had died in solitary confinement and that he was in fact, Mike Cohen. He was extremely tense and agitated and at several points in the session he would just repeat himself and ignore questions that I asked. He did seem to be occupied with his thoughts and at one point burst out laughing in an inappropriate way. He said that he is hallucinating currently, that machines speak to him saying "You're fucked up." He asked me if the lights had gone out at one point in the interview and says that he has the sensations of the lights going off periodically. Generally his mood was extremely tense but, as mentioned above, he was at times very inappropriate in his affect.

read these reports (they were in the district court file), we find that they were not substantial evidence of appellant's present incompetency. Each of these reports addresses itself to appellant's mental capacity to stand trial as of the date of the examination and prior to any commitment for treatment. Dr. Jones' report specifically refers to appellant's "current mental state." Dr. Beigel's report states that appellant was not competent to stand trial "at the present time." Dr. Beigel also suggests that appellant's severe state of agitation which impaired his ability to assist counsel was "being contributed to by his current medication" and recommended that appellant "be reevaluated . . . to determine whether his current state of agitation is secondary to a side effect from the medication." Neither report contains any opinion as to the

He expressed many fears of being harmed both by other prisoners and by his jailer as well as by me. He said that he had had thoughts of suicide but that he was afraid that he would "keep coming back" if he killed himself.

1. In my opinion, Mr. Caplean is incompetent to stand trial. In his current mental state he does not seem to fully understand the proceedings against him nor do I feel that he is capable of assisting counsel.

2. In my opinion, Mr. Caplean is currently psychotic and an appropriate diagnosis would be schizophrenic reaction, paranoid type.

3. If Mr. Caplean is suffering from schizophrenia there is a good likelihood that he would benefit considerably from appropriate anti-psychotic medications. (He says that he is currently taking Mellaril of an unknown dosage but in my opinion he needs a higher dose of that medication or a different anti–psychotic drug that would be more potent.)

4. It is my recommendation that Mr. Caplean be hospitalized in a psychiatric facility where he can be thoroughly evaluated and offered appropriate treatment.

5. I am unable to offer an opinion about Mr. Caplean's mental condition at the time of the alleged crime because he is unable to tell me about his thoughts and feelings associated with the alleged crime."

The report of Dr. Beigel provides as follows: "At the request of the Pima County Superior Court, pursuant to the provisions of Rule 11, the above–named individual was examined by me psychiatrically in my office at the Southern Arizona Mental Health Center on October 4, 1978. Prior to the examination, no medical or legal records were forwarded to me for my review.

Mr. Caplan is a short, slender man appearing slightly younger than his stated age of 31. During the entire examination, he displays extreme agitation and is frequently unable to sit in a chair, getting up frequently to pace about the room. His thought processes demonstrate evidence of marked circumstantiality, blocking, and tangentiality. However, no loosening of associations is noted.

His affect is extremely labile with occasional episodes of shouting as he becomes more agitated. No evidence of suicidal or homicidal ideation is noted.

Mr. Caplan is markedly paranoid, stating at the beginning of the interview, 'do you have guns?' He expresses numerous fears that I may hurt him and indicates that he is hearing of people talking and 'planning to jump me'.

He is disoriented as to time, but oriented to person and place. His judgment and insight are markedly impaired.

Mr. Caplan is aware of the charges against him although his recollection of the events which led to his arrest is very limited. He is also aware of the possibility that he may go to prison if convicted on the present charges. Nevertheless, at the present time, I do not view Mr. Caplan as being competent to stand trial because of his current paranoid state. The severe degree of agitation which accompanies it impairs his ability to assist counsel in the preparation of his defense although he does know and understand the nature of the charges against him. It is quite possible that his state of agitation is being contributed to by his current medication, which is Mellaril (at approximately 450 mgs. per day). Mr. Caplan should be reevaluated by a physician to determine whether his current state of agitation is secondary to a side effect from his medication.

*Mental State at the Time of the Alleged Offense*
Mr. Caplan has a lengthy history of mental illness and has been hospitalized on several different occasions at a wide variety of institutions, primarily in Maryland.

He has been a long–time user and abuser of drugs, principally marijuana and sedatives. He has been arrested on previous occasions for drug offenses and has been incarcerated in prison.

Because of Mr. Caplan's current state of severe agitation, it is difficult to make an accurate determination of his mental state at the time of the alleged offense since his recollection for those events is very limited. He was probably under the influence of drugs at that time and this impaired his judgment. At the same time, it is unlikely, given the nature of the drugs which he states he was using, that it would have impaired his ability to know and appreciate the nature and consequences of his acts or to differentiate between right and wrong."

capacity of appellant to stand trial at some future date. There were no later opinions of Dr. Jones or Dr. Beigel as to appellant's competency as of the March 26, 1979 date of determination of competency.[9]

### 3. Sufficiency of the Evidence

Appellant claims that the evidence showed only that he was an occasional customer of Alma Waits, and not a co–conspirator. He freely admits that he possessed marijuana and distributed it within the United States, but contends that the government failed to show that he had any agreement or understanding with Waits upon which a conspiracy conviction could be supported.

In considering appellant's claim that the evidence is legally insufficient to establish a conspiracy, our task is to determine whether, after "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We have concluded that the evidence clearly establishes that appellant was a conspirator.

▬▬ "A conspiracy is defined as a combination of two or more persons to accomplish some unlawful purpose, or some lawful purpose by unlawful means." *United States v. Heck*, 499 F.2d 778, 787 (9th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974). However, "[t]o establish a conspiracy, the government need not prove the existence of a formal agreement. Rather, an agreement may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for accomplishment of a common purpose." *United States v. Martin*, 567 F.2d 849, 851 (9th Cir. 1977). In the matter

before us the evidence was sufficient to allow an inference to be made that such an agreement existed. The cases relied upon by appellant do not advance his argument to the contrary. Appellant refers us to the following three cases:

In *United States v. Fellabaum*, 408 F.2d 220 (7th Cir.), *cert. denied*, 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109 (1969), the court summarized the familiar requirements for the crime of conspiracy and emphasized the need for an agreement between the conspirators. The court then concluded that sufficient evidence had been produced for the jury to infer that the charged conspiracy existed and that the defendants were conspirators therein. The court did not require that the evidence show a formal agreement. In *United States v. Spanos*, 462 F.2d 1012 (9th Cir. 1972), also cited by appellant, this court reversed a conspiracy conviction due to the failure of the prosecution to make out a prima facie case of the actual conspiracy charged. The most the evidence showed was that a certain person had bought amphetamines from the defendant on one occasion but had been refused purchase of additional quantities on two subsequent occasions. In *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), this court reversed the conviction of one of the defendants on a conspiracy charge where the evidence merely showed that the defendant had been present at times when members of the conspiracy had been present, and that he was acquainted with some of the conspirators.

In *Spanos* and *Basurto* this court reversed the defendants' convictions because the evidence was insufficient to establish a criminal conspiracy. In the matter before us, there was substantial evidence to support the conviction.

As mentioned in detail above, Waits testified that she "fronted" a quantity of marijuana to appellant on her trip to Oklahoma

---

9. We are not called upon by the facts before us to rule upon a trial court's sua sponte responsibility when faced with a report from the hospital where the defendant was committed as incompetent which concludes that his capacity to stand trial has now been restored and which is in conflict with a psychiatric report in the court's file which states that competency will *not* be restored in the foreseeable future.

City and that he did not pay her for it until he had resold it in the east. She also testified that appellant exhorted her to "push harder" to get the Mexican suppliers to bring more marijuana up from Mexico. Further, her testimony as to appellant's negotiations with the suppliers in regard to price, quality and quantity of marijuana paints a picture of someone substantially more involved in the overall operation of marijuana smuggling and sales than a mere occasional customer. This testimony taken together is clearly sufficient evidence from which the jury could have determined beyond a reasonable doubt that a concert of action existed between Waits, the appellant and others, for the accomplishment of a common unlawful purpose—the importation, possession and distribution of marijuana.

The judgment of conviction is AFFIRMED.